Case 1:08-cv-00582    Document 31-4    Filed 05/12/2008    Page 1 of 14

# Exhibit 3

Not Reported in F.Supp.  Page 1
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158
(Cite as: Not Reported in F.Supp., 1996 WL 465400)

CMark v. Keycorp Mortg. Inc.
N.D.Ill.,1996.

United States District Court, N.D. Illinois, Eastern Division.
Lance J. MARK, and all others similarly situated, Plaintiffs,
v.
KEYCORP MORTGAGE INC., Defendant.
No. 95 C 4878.

Aug. 8, 1996.

*MEMORANDUM OPINION AND ORDER*

ZAGEL, District Judge.
*1 On December 29, 1977, Lance Mark executed a mortgage bond in the principal amount of $42,400. The mortgage has been serviced by Keycorp Mortgage Inc. ("KMI") [FN1] The mortgage requires monthly payments of principal, interest and taxes. In return, KMI remits funds from the escrow account to taxing authorities for the payment of such taxes when due.

> FN1. On March 31, 1995, the servicing of the mortgage was sold to Nationsbanc Mortgage Corporation of New York. Pursuant to an agreement between KMI and Nationsbanc, the defense of this litigation remained with KMI.

Mark alleges that KMI has engaged in overescrowing and thus has breached its contractual agreement with him, breached its fiduciary duty to him, misrepresented its escrow account servicing practices, engaged in unfair and deceptive acts and practices, and violated Racketeering Influenced and Corrupt Organizations Act (RICO). I read KMI's motion as seeking summary judgment on the contract claim and to dismiss the remaining claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

*Discussion*

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. Gibson v. Chicago, 910 F.2d 1510, 1520 (7th Cir.1990). A complaint should be dismissed under Rule 12(b)(6) only if the plaintiff has failed to allege any set of facts upon which relief may be granted. Id. at 1521.

Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). All reasonable inferences must be drawn in the light most favorable to the non-movant. Anderson v. Stauffer Chemical Co., 965 F.2d 397, 400 (7th Cir.1992).

*Breach of Contract*

Mark alleges that KMI breached the mortgage contract and violated the Real Estate Settlement Procedures Act (RESPA) by collecting and maintaining excessive balances in his escrow account. Mortgage lenders typically require mortgagors to make monthly payments of principal and interest, as well as taxes and insurance premiums to be placed in an escrow account, plus an additional sum known as a "cushion." The mortgage contract sets the amount at which lenders may charge, including the size of the "cushion." However, the contract provisions may not exceed the ceiling provided by RESPA.

Section 10(a)2 of RESPA provides that a lender may charge a borrower a monthly sum equal to one-twelfth of the total annual escrow payments that the lender reasonably anticipates paying from the account. 12 U.S.C. § 2609(2). In addition, a lender may add an amount to maintain a cushion equal to one-sixth of the estimated total amount of these annual payments from the account. Id. Thus, lenders are permitted to collect monthly escrow payments in excess of the amounts actually necessary to pay tax and insurance premiums as they come due, but they cannot collect greater than a two month "cushion."

Mark's mortgage contract provides the following:

> together with, and in addition to, the monthly payments of principal and interest payable under the terms of the bond secured hereby, the Mortgagor shall pay to the Mortgagee as Trustee ... on the first day of each month until the said bond is fully paid, the following sums: (a) A sum equal to the ground rents, if any and the taxes and special assessments next due on the premises covered by this mortgage, plus the premiums that will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 2
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158
**(Cite as: Not Reported in F.Supp., 1996 WL 465400)**

next become due and payable on policies of fire and other hazard insurance on the premises covered hereby (all as estimated by the Mortgagee, and of which the Mortgagor is notified) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent, such sums to be held by Mortgagee in trust to pay said ground rents, premiums, taxes, and special assessments before the same become delinquent.

*2 3. If the total of the payments made by the Mortgagor under (a) of paragraph 2 preceding shall exceed the amount of payments actually made by the Mortgagee as Trustee for ground rents, taxes, assessments, water rates, or insurance premiums, as the case may be, such excess shall be credited on subsequent payments to be made by the Mortgagor for such items, or, at the option of Mortgagee as Trustee, shall be refunded to the Mortgagor. If, however, such monthly payments shall not be sufficient to pay such items when the same shall become due and payable, then the Mortgagor shall pay to the Mortgagee as Trustee any amount necessary to make up the deficiency.

Mark's contract calls for a one month cushion. Because RESPA sets the ceiling for the cushion amount, the contract language controls and KMI may only collect a one month cushion in excess of the amounts necessary to make the payments.

In servicing escrow accounts, mortgage lenders may account for escrow balances through either an aggregate or an individual-item accounting method.[FN2] KMI defends its escrowing practices by asserting that it uses single-item analysis, a legal method of accounting for escrow accounts; therefore, there can be no violation. However, it is outcome not methodology that is determinative here. If KMI has required payments that cause the balance in the escrow account to exceed the one month cushion set by the contract, then it has breached the terms of the contract regardless of the accounting method used. *Sanders v. Lincoln Service Corp.*, 1993 WL 112543, at *2 (N.D.Ill.1993); *Aitken v. Fleet Mortg. Corp.*, 1992 WL 33926, at *3 (N.D.Ill.1992); *Hoffman v. Bancboston Mortgage Corp.*, No. CV-91-1880, at *6 (Mobile County, Alabama Cir.Ct. October 12, 1993).

> FN2. The Department of Housing and Urban Development (HUD) has promulgated a new rule which requires mortgage servicers to use the aggregate method of accounting for escrow accounts involving federally related mortgage loans that are settled on or after April 24, 1995. 59 FR 53890-01. However, there is a three-year phase-in period for existing escrow accounts to convert to the aggregate accounting method. *Id.* Thus, Mark's account may still be calculated using single item analysis.

KMI continues to justify its use of single-item analysis and cites to the opinion of former HUD Deputy Assistant Secretary Patricia Worthy. The opinion states that the phrase "one-twelfth of the total amount" is interpreted as applying to each charge separately and not implying an aggregation method of accounting. It further states that an interpretation that section 10(2) prescribed an aggregation method would result in an internal inconsistency, which should be avoided. HUD informal Opinion No. 155, dated February 6, 1980 reported in Paul Barron and Michael A. Berenson, *Federal Regulation of Real Estate,* at A2.04[3] (3d ed. 1983). Thus, KMI argues, in order to determine whether an excess exists in the account, the court must look to each charge separately to see if an excess exists in these separate accounts. However, the language of RESPA could not be more clear, a lender may maintain a cushion "not to exceed one-sixth of the estimated *total* amount of such taxes, insurance premiums and other charges to be paid." 12 U.S.C. § 2609(2) (emphasis added). Furthermore, informal opinion no. 155 was withdrawn when HUD issued its interpretive rule on January 21, 1993. 58 FR 5520. Therefore, to determine if an excessive cushion has been maintained, this Court must look to the total account balances after payment of taxes. See *Aitken,* 1992 WL 33926, at *3; *Leff v. Olympic Federal Sav. & Loan Assn.,* 1986 WL 10636, at *5 (N.D.Ill.1986).

| Date    | Transaction | Amount | Balance |
|---------|-------------|--------|---------|
| 2/11/91 | payment     | 251.24 | 1105.57 |
| 3/11/91 | payment     | 251.24 | 1356.81 |
| 3/25/91 | payment     | 5.73   | 1362.54 |
| 4/8/91  | payment     | 251.24 | 1613.78 |

Case 1:08-cv-00582 Document 31-4 Filed 05/12/2008 Page 4 of 14

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158
(Cite as: Not Reported in F.Supp., 1996 WL 465400)

| Date | Type | Amount | Balance |
|---|---|---|---|
| 5/6/91 | payment | 295.19 | 1908.97 |
| 5/31/91 | payment | 295.19 | 2204.16 |
| 6/17/91 | debit | 983.29- | 1220.87 |
| 6/28/91 | payment | 295.19 | 1524.70 |
| 8/9/91 | payment | 295.19 | 1819.89 |
| 9/9/91 | payment | 295.19 | 2115.08 |
| 9/19/91 | debit | 1422.05- | 693.03 |
| 9/30/91 | payment | 8.18 | 701.21 |
| 10/7/91 | payment | 295.19 | 996.40 |
| 10/30/91 | payment | 295.19 | 1291.59 |
| 11/26/91 | payment | 295.19 | 1586.78 |
| 12/30/91 | payment | 295.19 | 1881.97 |
| 12/31/91 | payment | 6.50 | 1888.47 |
| 1/21/92 | debit | 949.17- | 939.30 |

*3 This chart reveals that after payment of taxes in June 1991, September 1991 and January 1992, the account had balances of $1220.87, $693.03 and $939.30 respectively. This is more than twice, and as high as three times, the cushion permitted by the contract. The amount remaining in the account should have been no higher than $295.19, one month's cushion. The account balances for the years 1989 through 1994 also reflect account balances in excess of the permitted one month cushion after taxes were paid. KMI has thus breached the contract agreement.[FN3]

> FN3. Because account balances in excess of two month's cushion were found, RESPA has been violated as well.

Mark contends that these excess payments should have been treated as prepayments of principal. However, the contract states that it is the option of the mortgagee to credit the excess to subsequent payments or refund the excess to the mortgagor. Keycorp has done neither, and thus has breached this portion of the contract as well.

This Court's holding is not a finding that single item analysis is an illegal method since HUD has explicitly stated that it is a valid method for now and I have so found. 59 FR 53890-01;*Aitken*, 1992 WL 33926 at *2. However, if lenders are going to use single item analysis, they must insure that the totals left in the account after taxes are paid, do not exceed the cushion that is allowed. The Attorneys General Report relating to overescrowing practices recommends that if single item accounting is used, the lender should treat all of the money in the hypothetical sub-accounts as available to meet all of the consumer's obligations and should make adjustments to the account as are necessary to ensure that excessive surpluses are not maintained. Overcharging on Mortgages: Violations of Escrow Account Limits by the Mortgage Lending Industry, A Report by the Attorneys General of California, Florida, Iowa, Massachusetts, Minnesota, New York, and Texas. The Report's recommendations are consistent with RESPA's requirement that the deposit each month to the account be no more than the "sum" of all of the separate items. 12 U.S.C. § 2609(b).

*Fiduciary Duty*

Mark claims KMI breached its fiduciary duty to fairly and truthfully report upon the disposition of his funds, and to demand deposit of only the funds actually required to make escrow payments. KMI argues that there is no fiduciary relationship. However, New York law regards the escrow relationship as a fiduciary one. *George A. Fuller Co. v. Alexander & Reed, Esqs.*, 760 F.Supp. 381, 386 (S.D.N.Y.1991); *Davis v. Dime Sav. Bank of New York, FSB*, 158 A.D.2d 50, 52; 557 N.Y.S.2d 775, 776 (1990); *Animalfeeds Intern. Inc. v. Banco Espirito Santo E Comercial De Lisboa*, 101 Misc.2d 379, 383; 420 N.Y.S.2d 954, 957 (1979); *Bardach v. Chain Bakers, Inc.*, 265 A.D. 24; 37 N.Y.S.2d 584, 587 (1942), *aff'd*, 290 N.Y. 813; 50 N.E.2d 233 (1943).

*4 KMI next argues that if a fiduciary duty is found, the duty cannot be broader than the express terms of the agreement and in this case is limited to the timely payment of real estate taxes. It is true that KMI's fiduciary duties are limited to those obligations expressly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00582   Document 31-4   Filed 05/12/2008   Page 5 of 14

Not Reported in F.Supp.                                                                                   Page 4
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158
(Cite as: Not Reported in F.Supp., 1996 WL 465400)

contracted for in addition to the positive duties which the law imposes when a contract exists, *Beckford v. Empire Mut. Ins. Group,* 135 A.D.2d 228, 233; 525 N.Y.S.2d 260, 263 (1988), but the mortgage contracts for more than the timely payment of real estate taxes. KMI is obligated under the contract to estimate the necessary monthly payments of principal, interest and taxes, plus no more than a one month cushion. KMI is further obligated to refund to the mortgagor or credit to the account any excess that may have been collected. KMI failed to perform both obligations as it estimated and collected a monthly mortgage payment in excess of the one month cushion allowed and it failed to refund or credit the excess. Thus, not only has KMI breached the contract, as a fiduciary, KMI has breached its fiduciary duties to Mark. "[T]he same conduct which constitutes a breach of a contractual obligation may also constitute the breach of a duty arising out of the contract relationship which is independent of the contract itself." *Davis,* 158 A.D.2d at 52, 557 N.Y.S.2d at 776.

*Intentional and/or Negligent Misrepresentation*

Mark alleges that Keycorp intentionally, knowingly and/or negligently serviced his account so as to require escrow balances far in excess of those permitted under his contract and misrepresented the status of his account. These allegations are identical to his claim for breach of contract.

It is a well accepted rule that a cause of action does **not** arise when the **alleged fraud** is related to a **breach of contract.** *Crabtree v. Tristar Automotive Group, Inc.,* 776 F.Supp. 155, 162 (S.D.N.Y.1991). A claim of misrepresentation that does not allege any facts extraneous and collateral to the breach of contract claim, nor seeks compensation that would not be fully compensated by the contract claim, must be dismissed as redundant to the contract claims. *R.H. Damon & Co. v. Softkey Software Prods.,* 811 F.Supp. 986, 992-93 (S.D.N.Y.1993). Thus, Count IV of the complaint is dismissed as duplicative.

*Unfair and Deceptive Practices*

Mark asserts that KMI's practice of overescrowing is an unfair and deceptive practice under New York General Business Law (GBL) § 349(d). It is an "unfair" practice, Mark claims, because the mortgagee has the power to unilaterally determine how much the borrower must pay, and once the amount is determined the borrower has no choice but to pay that amount or default and face foreclosure. It is a "deceptive" practice, he adds, because most borrowers are unable to perform the mathematical computations necessary to determine proper escrow requirements, they accept their lenders' representations concerning the proper requirements on faith and are not aware that excessive amounts are required.

*5 KMI's assertion that it has an absolute defense to this claim because it has fully complied with federal law is of no merit since I have already found KMI in violation of the contract and of RESPA.

New York GBL § 349 prohibits unfair and deceptive business practices. The elements of a violation of GBL § 349 are (1) proof that the practice was deceptive and misleading in a material respect and (2) proof that plaintiff was injured. *Yochim v. McGrath,* 165 Misc.2d 10, 17; 626 N.Y.S.2d 685, 689 (1995); *Giarratano v. Midas Muffler,* 166 Misc.2d 390, 398; 630 N.Y.S.2d 656, 661-62 (1995); *Bartolomeo v. Runco,* 162 Misc.2d 485, 490; 616 N.Y.S.2d 695, 699 (1994). GBL § 349 requires the conduct at issue be recurring or have ramifications for the general public. *Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 53 (2nd Cir.1992). There is no requirement under GBL § 349 that a plaintiff prove the defendant's practices or acts were intentional, fraudulent or even reckless. Nor is there any clearly established requirement under GBL § 349, as presently construed, that plaintiff prove that he relied upon the defendant's misrepresentations and deceptive practices. *Yochim,* 165 Misc.2d at 17; 626 N.Y.S.2d at 690; *Giarratano,* 166 Misc.2d at 398; 630 N.Y.S.2d at 662. *Bartolomeo,* 162 Misc.2d at 490; 616 N.Y.S.2d at 699.

Mark has adequately alleged both elements of his claim. The sending of statements and bills for the escrow account which misrepresent the amount that may be legally charged is both unfair and deceptive. The mortgagor is at the mercy of its lending institution, he must either pay the bill sent to him or risk an action for default and foreclosure. Furthermore, the escrow computations are complicated and are not easily performed by the average borrower. Thus, a borrower is likely to rely upon the statements sent to him by his lender and believe them to be accurate. In addition, Mark has adequately alleged his injury as KMI has overcharged him for several years and alleges KMI has overcharged a large class of people.

*Collateral Estoppel*

Case 1:08-cv-00582   Document 31-4   Filed 05/12/2008   Page 6 of 14

Not Reported in F.Supp.  Page 5
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158
**(Cite as: Not Reported in F.Supp., 1996 WL 465400)**

KMI next asserts that the issues in this case are precluded by collateral estoppel because they have already been decided in *Distafano v. Keycorp Mortgage Inc.,* New York State Supreme Court, Erie County [decision unreported], aff'd,212 A.D.2d 994; 624 N.Y.S.2d 1000 (1995). Federal courts are required by 28 U.S.C. § 1738 to give effect to the collateral estoppel rules of the state that rendered a prior judgment where the same issues are raised later in a federal proceeding. *Migra v. Warren City School Dist. Bd. of Educ.,* 465 U.S. 75, 81 (1984); *Wilder v. Thomas,* 854 F.2d 605, 616 (2nd Cir.1988). Thus, our determination of the preclusive effect of the prior New York judgment in this case requires an analysis of the collateral estoppel effect that would be accorded the prior judgment under New York's standards for collateral estoppel. *Wilder,* 854 F.2d at 616.

*6 There are two requirements for collateral estoppel under New York law. First, there must be an identity of issues which has necessarily been decided in the prior action and is decisive of the present action. Second, there must have been a full and fair opportunity to contest the decision now said to be controlling. *Wilder,* 854 F.2d at 617, quoting *Schwartz v. Public Adm'r of Bronx County,* 24 N.Y.2d 65, 71 (1969). Even if the issues were identical in the state court, that decision must also have been necessary to the court's judgment. *Wilder,* 854 F.2d at 620.

The issues addressed in the *Distafano* opinion are very similar to the ones present in this case. It is unclear whether the court in *Distafano* made any findings with respect to KMI's mortgaging practices in general, but did find "that as between these plaintiffs and this defendant," there is no violation. The court's finding that overescrowing did not occur is thus limited to Distafano's mortgage escrow account and cannot estop Mark from litigating the same issues as they apply to his particular circumstances.

*RICO*<sup>FN4</sup>

FN4. This case was transferred to the Northern District of Illinois by the Judicial Panel on Multidistrict Litigation from the Western District of New York pursuant to 28 U.S.C. § 1407(a) for consolidated pretrial proceedings with other cases that share common questions of fact. In deciding the federal law claims at issue in this case, this Court must apply Seventh Circuit law since a transferee court must apply the law of its circuit to interpret federal law claims under a section 1407 transfer. *In re Korean Airlines,* 829 F.2d 1171 (D.C.Cir.1987), aff'd, *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122 (1989). KMI asserts that the federal law decisions of the transferor forum must be applied to the federal law claims at issue here based on the Seventh Circuit opinion in *Eckstein v. Balcor Film Investors,* 8 F.3d 1121 (7th Cir.1993), cert. denied,114 S.Ct. 883 (1994). However, KMI misreads that decision. *Eckstein* affirmed the decision in *Korean Airlines,* but drew a narrow exception when the federal law to be applied is not intended to be geographically uniform among the circuits. *Eckstein,* 8 F.3d at 1126-27. Under *Eckstein,* when the federal law is interpreted differently among the circuits, but is meant to have only one interpretation, as with RICO law, the law of the transferee court applies. *Id.* I will thus apply Seventh Circuit RICO law to this case.

Mark alleges that KMI has violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), by engaging in a pattern of mail fraud, receiving money as a result, while associated with a corporate group and conducting part of the mortgage servicing activities of that enterprise. Section 1962(c) makes it unlawful for

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

KMI asserts that the RICO claim fails (1) to identify an enterprise distinct from KMI, 2) to establish the predicate acts, and (3) to establish any nexus between the predicate acts and the enterprise.

1. Section 1962(c) requires there to be an "enterprise" and a "person" and for them to be separate and distinct entities. *Haroco v. American Nat. Bank & Trust Co. of Chicago,* 747 F.2d 384, 400 (7th Cir.1984), aff'd,473 U.S. 606 (1985). Mark alleges that KMI is the "person" under the statute and is distinct from Keycorp, the "enterprise." He further alleges that Keycorp is an enterprise engaged in the business of commercial and consumer finance and

Not Reported in F.Supp.                                                                                           Page 6
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158
**(Cite as: Not Reported in F.Supp., 1996 WL 465400)**

that KMI is its subsidiary engaged in the business of servicing residential mortgage transactions.

KMI claims a subsidiary corporation cannot be considered a distinct entity from its parent corporation. However, the Seventh Circuit in *Haroco* held just the opposite. It held that a subsidiary corporation is a legal entity distinct from its parent corporation for purposes of section 1962(c). *Id.* at 402. Thus, Mark's allegations sufficiently identify a "person," KMI, distinct from an "enterprise," Keycorp.

2. KMI next claims that Mark has failed to allege any necessary predicate acts to establish a pattern of racketeering activity. The predicate acts alleged are violations of the mail fraud statute, 18 U.S.C. § 1341. A person commits mail fraud by using the mails for the purpose of executing a scheme or artifice to defraud. *United States v. Wormick*, 709 F.2d 454, 461-62 (7th Cir.1983). To sufficiently plead a case of mail fraud, Mark must allege (1) that KMI has participated in a scheme to defraud, and (2) that KMI has mailed or has knowingly caused another to mail a letter or other matter for the purpose of executing the scheme. *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir.1994). As part of these allegations, Mark must satisfy Federal Rule of Civil Procedure 9(b) and plead the predicate acts of mail fraud with particularity. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir.1994).

*7 To satisfy Rule 9(b), a RICO plaintiff is required only to provide "a general outline of the alleged fraud scheme-one sufficient to reasonably notify the defendants of their purported role." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992). To accomplish this, Mark "must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." *Jepson*, 34 F.3d at 1328. "The complaint must also allege facts from which it reasonably may be inferred that the defendants engaged in the scheme with fraudulent intent." *Id.*

Mark asserts in his complaint that KMI mailed to him statements,[FN5] that knowingly misrepresented the amount he was required to deposit in his escrow account. He further alleges that KMI intended to have him rely upon these false statements and infers that he did rely upon them. These allegations are sufficient to allege the predicate acts of mail fraud as Mark has alleged the existence of a scheme to defraud, the overescrowing practice, and the use of the mails to execute the scheme, by mailing the statements. Nearly identical allegations were upheld as establishing the predicate acts for mail fraud in *Butler v. Platte Valley Mortg. Corp.*, 94 C 3327, at *10-11 (N.D.Ill.1995) (unreported decision) (allegations that annual mailings of statements misrepresenting the amounts the mortgage agreements obligated them to deposit were sent deliberately for the purpose of taking advantage of the borrowers, were relied upon, and enhanced the lender's profits stated a claim of mail fraud) and *Aitken*, 1992 WL 33926, at *5 ("[t]he intentional submission of inaccurate requests for payment pursuant to a contractual relationship with the intent of obtaining funds not due under the contract may amount to a scheme to defraud").

> FN5. Examples of which are attached, thus satisfying the time, place and content of the mail communications to satisfy the Rule 9(b) requirements.

KMI maintains that the second prong of the test has not been met since the mails were used primarily for convenience and were not incident to the scheme. KMI asserts that if the scheme could be carried out without the use of the mails, mail fraud has not been alleged. This is not the test. The mailing need only work "in furtherance" of the scheme. *United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir.1992). This "in furtherance" requirement is to be broadly read and applied. *Id.* To meet it, the use of the mails need not be indispensable to the success of the scheme, but must be incident to an essential part of the scheme, or step in the plot. *United States v. Brocksmith*, 991 F.2d 1363, 1367 (7th Cir.), *cert. denied*, 510 U.S. 999 (1993), citing *Schmuck v. United States*, 489 U.S. 705, 711 (1989). The scheme was to obtain excessive payments from Mark. In order to obtain these payments, KMI had to inform Mark how much he owed through statements and bills. This was accomplished through the use of the mails to deliver the statements. The fact that KMI could have informed Mark how much he owed on the escrow account by a means other than the mails is irrelevant, as KMI chose to use the mails to further its scheme.

*8 3. KMI next claims that Mark has failed to establish a nexus between the predicate acts and the enterprise because he has not alleged an independent or participatory activity by members of the corporate group and that KMI's actions were its own.

To demonstrate the appropriate nexus between the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00582 Document 31-4 Filed 05/12/2008 Page 8 of 14

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158
(Cite as: Not Reported in F.Supp., 1996 WL 465400)

racketeering activity and the affairs of the enterprise, Mark must establish that KMI's position in, or relationship with, the enterprise facilitated the commission of the acts, and that the acts had some effect on the enterprise. *U.S. v. Horak,* 833 F.2d 1235, 1239 (7th Cir.1987).

The Seventh Circuit in *Haroco,* in response to the defendant's assertion that plaintiff had not adequately alleged a relationship between the defendant and its parent corporation, or the way in which defendant participated in the affairs of its parent, held that it is "virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation." *Haroco,* 747 F.2d at 402-03;*See also United States v. Horak,* 833 F.2d 1235, 1239 (7th Cir.1987). Mark alleges that KMI is part of a group headed by Keycorp, the group consists of the commonly owned corporations engaged in the common business of commercial and consumer finance, Keycorp Mortgage is engaged in the business of servicing residential mortgage transactions, and the subsidiary, KMI, conducted those businesses through the pattern of fraud alleged. These allegations are sufficient under *Haroco* to establish the participation of the corporate group since a parent subsidiary corporation relationship has been alleged. Mark has further satisfied the burden that any benefit KMI received through its racketeering activity "had some effect" on its parent corporation as it is reasonable to infer that any revenue derived from the escrow accounts was channelled up to Keycorp. *Horak,* 833 F.2d at 1240.

Furthermore, Mark's allegations are identical to those upheld in both *Aitken* and *Butler* as establishing a nexus between the predicate acts and the enterprise. *Aitken,* 1992 WL 33926, at *6 (allegation that "Fleet is part of the Fleet/Norstar Financial Group; that the group consists of a number of commonly owned corporations engaged in the common business of commercial and consumer finance; that Fleet is engaged in the business of servicing residential mortgage transactions; and that the subsidiary, Fleet, conducted those businesses through the pattern of fraud alleged" satisfies the nexus requirement); and *Butler,* 94 C 3327 at *6 (allegation that parent corporation conducts a mortgage-servicing business through several mortgage servicing subsidiaries and the defendant subsidiary conducted the mortgage servicing responsibilities at issue here provided a sufficient nexus for the RICO claim).

*Conclusion*

The motion for summary judgement on the contract claim is denied. The motion to dismiss the claims of fiduciary duty, unfair and deceptive practices and RICO are denied. The motion to dismiss the misrepresentation claim is granted.

N.D.Ill.,1996.
Mark v. Keycorp Mortg. Inc.
Not Reported in F.Supp., 1996 WL 465400 (N.D.Ill.), RICO Bus.Disp.Guide 9158

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2008 WL 1722140 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 1722140)

Page 1

Jada Toys, Inc. v. Chicago Import, Inc.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
JADA TOYS, INC., Plaintiff and Counter-Defendant,
v.
CHICAGO IMPORT, INC., Defendant and Counter-Plaintiff.
No. 07 C 699.

April 10, 2008.

David F. Wentzel, Daniel Paul Derechin, Wentzel Law Offices, Chicago, IL, for Plaintiff and Counter-Defendant.
Ronald R. Rassin, Susan A. Stoddard, Gordon & Rappold LLC, Chicago, IL, Michelle S. Tamkin, Haney Buchanan and Patterson, Steven H. Haney, Attorney At Law, Los Angeles, CA, for Defendant and Counter-Plaintiff.

*MEMORANDUM OPINION AND ORDER*

GERALDINE SOAT BROWN, United States Magistrate Judge.
*1 In an earlier oral ruling, the court denied the motion of Plaintiff/counter-defendant Jada Toys, Inc. ("Jada") to dismiss Count I of the Amended Counterclaim filed by Defendant/counter-plaintiff Chicago Imports, Inc. ("Chicago Imports"). [Dkt 67.] FN1 The portion of the motion seeking to dismiss Count II of the Amended Counterclaim was taken under advisement. Discovery proceeded, and new counsel appeared for Jada. [Dkt 74.] This opinion rules on Jada's motion to dismiss Count II.

> FN1. Chicago Imports had filed its initial counterclaim earlier [dkt 41], but after Jada moved to dismiss that counterclaim [dkt 44, 46], Chicago Imports sought leave to file an Amended Counterclaim, which the court allowed [dkt 52, 56, 57].

Count I of the Amended Counterclaim alleges that Jada breached an oral agreement to sell toy cars to Chicago Imports at the same prices Jada was selling the toys to distributors in New York and California. (Am.Countercl.¶ 10.) Count II alleges fraud in the inducement of that agreement. Specifically, Chicago Imports alleges that Jada's representative Jack Lee stated, in a conversation in Chicago in 1999, that Jada would sell the cars to Chicago Imports at the same prices, but that Mr. Lee's statement was part of a scheme to defraud because Jada never intended to carry out that promise. (Am.Countercl.¶¶ 8, 10, 16, 18, 20.)

Jada first argues that Count II should be dismissed because it is not pled with the requisite specificity. (Jada's Mem. Law at 9-10.) [Dkt 61].Fed.R.Civ.P. 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."That means that a complaint alleging fraud must provide "the who, what, when, where, and how...."*DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Count II satisfies that requirement.

Jada's main argument, however, is that Count II fails to state a claim because it fails to sufficiently allege the "scheme to defraud" required by Illinois law for a claim of promissory fraud.FN2 (Jada's Mem. Law at 10-13.) Chicago Imports alleges, in a conclusory way, that Jada's representation that it would sell cars to Chicago Imports at the same prices it was selling to others "was part of a scheme to defraud."(Am.Countercl.¶ 20.) It also alleges that from 1999 to 2006, Chicago Imports entered into a series of agreements to buy toys from Jada in reliance on that representation. (*Id.* ¶¶ 22, 23.)Thus, it alleges one representation and a series of acts over seven years in reliance on that representation. The issue is whether that is sufficient to allege a "scheme to defraud" under Illinois law.

> FN2. The parties agree that Illinois law governs Count II. (Jada's Mem. Law at 10; Chicago Imports' Resp. at 9 [dkt 63].)

Under Illinois law, misrepresenting an intention to **perform** future conduct, even if made without a present intention to **perform**, does **not** constitute

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fraud. *HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 682 (Ill.1989) (citations omitted). However, Illinois has recognized an exception to that rule. Under that exception, such promises are actionable if "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud."*Id.* (citations omitted). Thus, under Illinois law, the promise must be part of a scheme to defraud in order to state a claim for promissory fraud.[FN3]

> FN3. The Illinois Supreme Court recently reinforced the fact that Illinois law does not recognize fraud as the making of a promise that one does not intend to keep. *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 844 (Ill.2005). In that case, which involved the Consumer Fraud Act, the court stated, quoting an earlier decision by an Illinois appellate court:
>
>> What plaintiff calls "consumer fraud" or "deception" is simply defendants' failure to fulfill their contractual obligations. Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action.... We believe that a "deceptive act or practice" involves more than the mere fact that a defendant promised something and then failed to do it. That type of "misrepresentation" occurs every time a defendant breaches a contract.
>
> *Id.* (quoting *Zankle v. Queen Anne Landscaping,* 311 Ill.App.3d 308, 244 Ill.Dec. 100, 724 N.E.2d 988, 992-93 (Ill.App. 2nd Dist.2000)). Although *Avery* involved the Consumer Fraud Act, it emphasizes the law in Illinois that a simple failure to fulfill contractual obligations does not constitute fraud.

*2 The distinction between a false promise and a *scheme* of promissory fraud is elusive and has caused considerable uncertainty, as many courts have acknowledged. *See, e.g., Desnick v. American Broadcasting Cos., Inc.,* 44 F.3d 1345, 1354 (7th Cir.1995) (citing cases). While some courts suggest that the exception has swallowed the rule, others appear unwilling to apply the exception. *Id.;Bower v. Jones,* 978 F.2d 1004, 1011 (7th Cir.1992). As the *Desnick* court noted:

> The distinction certainly is unsatisfactory, but it reflects an understandable ambivalence, albeit one shared by few other states, about allowing suits to be based on nothing more than an allegation of a fraudulent promise. There is a risk of turning every breach of contract suit into a fraud suit, of circumventing the limitation that the doctrine of consideration is supposed however ineptly to place on making all promises legally enforceable, and of thwarting the rule that denies the award of punitive damages for breach of contract. A great many promises belong to the realm of puffery, bragging, "mere words," and casual bonhomie, rather than to that of serious commitment.

44 F.3d at 1354.

In terms of deciphering what is meant by "scheme to defraud," the Seventh Circuit has held that promissory fraud is actionable "if it is either particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy."*Id.* In another case, the Seventh Circuit described a scheme to defraud as "a pattern of fraudulent acts." *Speakers of Sport, Inc. v. ProServ, Inc.,* 178 F.3d 862, 866 (7th Cir.1999).[FN4]*See also Bower,* 978 F.2d at 1012 (stating that "[i]n order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent-a scheme or device").

> FN4. In *Speakers of Sport,* the discussion of Illinois law of promissory fraud was technically dicta. The plaintiff was a competitor of the defendant, and the claim asserted was tortious interference with business relations, not fraudulent inducement of a contract. 178 F.3d at 864. The court held that the allegedly false promise-that the defendant would obtain millions of dollars of endorsements for a star baseball player-was puffery because it

involved something over which the defendant had no control. *Id.* at 866.

In this case, Chicago Imports' allegations lack the elements that have distinguished a scheme to defraud from a mere false promise. For instance, in *HPI*, the scheme alleged consisted of *repeated* false promises of future payment in order to induce the plaintiff to continue provision of pharmaceutical goods and services. 137 Ill.Dec. 19, 545 N.E.2d at 683. In this case, there is no allegation that Jada repeatedly made false promises to induce Chicago Imports to continue purchasing from it. Chicago Imports alleges only one proposal by Jada to sell toy cars at the same prices it was selling to other distributors. (Am.Countercl.¶ 10.) Although Chicago Imports alleges that it entered into a "series of agreements" with Jada based on that proposal, the subsequent agreements entered into by the parties were based not on additional false promises or proposals, but, rather, on the single proposal alleged.

In another case, *Carl A. Haas Auto. Imports, Inc. v. Lola Cars Ltd.,* the court found that the plaintiff had sufficiently alleged a scheme to defraud based on allegations that the defendant falsely promised plaintiff that it would be defendant's exclusive distributor of Indy cars on a long-term basis. 933 F.Supp. 1381, 1392 (N.D.Ill.1996). In that case, the defendant made the false promise on the condition that the plaintiff terminate all existing relations with a competitor of the defendant, which the plaintiff did, and the defendant reiterated its assurance that plaintiff would serve as defendant's exclusive car dealer throughout the next few years. *Id.* Those facts are "particularly egregious," as the plaintiff allegedly gave up a lucrative contract in reliance on the defendant's false promise, and the defendant made *repeated* false assurances over a long period of time in order to induce the plaintiff's reliance.

*3 The facts pled in Chicago Imports' Amended Counterclaim are more akin to those found in cases where a motion to dismiss was granted. For instance, in *International Star Registry of Ill. v. ABC Radio Network, Inc.,* the court dismissed plaintiff's promissory fraud count where the complaint mentioned only one objective manifestation of a scheme to defraud, namely, that the defendant falsely represented that it would run plaintiff's advertisements with a certain frequency. 451 F.Supp.2d 982, 988 (N.D.Ill.2006). That single false promise did not qualify as particularly egregious, nor was it embedded in a larger pattern of deceptions or enticements that would reasonably induce reliance.*Id.* See also *ABM Eng. Servs. v. Thompson,* 2006 WL 1517776 at *3 (N.D.Ill. May 24, 2006) (Ashman, M.J.) (dismissing promissory fraud claim where plaintiff's allegations did not include other acts of trickery compounding the initial misrepresentations nor the suggestion that defendants perpetrated fraud on a regular basis, and did not amount to a series of misrepresentations or an elaborate artifice of fraud).

In summary, Chicago Imports' promissory **fraud** claim does **not** sufficiently allege a "scheme to defraud," and Illinois law does **not** allow a claimant to proceed on a promissory **fraud** claim based solely on a misrepresentation of intention to **perform** future conduct.

## CONCLUSION

Accordingly, Jada's motion to dismiss Count II of the Amended Counterclaim [dkt 60] is granted. Because Chicago Imports has already amended its Counterclaim once following a motion to dismiss, this dismissal as to Count II is with prejudice. All fact discovery on both the Complaint and on Count I of the Amended Counterclaim shall be noticed in time to be completed by June 9, 2008. This case is set for status on May 6, 2008.

**IT IS SO ORDERED.**

N.D.Ill.,2008.
Jada Toys, Inc. v. Chicago Import, Inc.
Slip Copy, 2008 WL 1722140 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1990 WL 41126 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 41126)**

HFirst Community Nat. Bank v. General Tire, Inc.
N.D.Ill.,1990.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Western Division.
FIRST COMMUNITY NATIONAL BANK, A National Banking Association, Plaintiff,
v.
GENERAL TIRE, INC., Defendant.
No. 89 C 20298.

March 26, 1990.

Stephen G. Balsley, Barrick-Switzer Law Firm, Rockford, Ill., for plaintiff.
Bradley T. Koch, Holmstrom & Kennedy, Rockford, Ill., for defendant.

ORDER

ROSZKOWSKI, District Judge.
*1 This action comes before the court on Defendant's motion to dismiss. For the reasons set forth herein, the court denies Defendant's motion to dismiss on the grounds that Plaintiff has failed to join a indispensable party to the action. The court, however, grants Defendant's motion to dismiss on the grounds that Plaintiff has failed to plead a cause of action for conversion. Plaintiff is given thirty days from the date of this order to file an amended complaint.

BACKGROUND

Plaintiff, First Community National Bank, filed suit in the United States District Court for the Northern District of Illinois on September 22, 1989, alleging an action for conversion of collateral. Plaintiff is a national banking association and has its principal place of business in the State of Illinois. Defendant, General Tire, is a corporation incorporated outside the State of Illinois and has its principal place of business in the State of Ohio. Jurisdiction of this court is based on diversity of citizenship with the amount in controversy exceeding $50,000.00. 28 U.S.C. §1332.

According to Plaintiff's complaint, Plaintiff extended eight loans to Busher Tire, Inc. beginning in October of 1986 and ending in February of 1989. The amount of the loans ranged from $16,829.00 to $550,000.00. The loans were secured by a security agreement dated April 22, 1987 that gave Plaintiff a security interest in all inventory, receivables and equipment of Busher Tire.

In May or June of 1989, Busher Tire gave Defendant 578 first class general tires having a wholesale value of $70,503.00 and 446 blemished or second rate tires with an unknown value. Defendant gave Busher Tire a credit against the amounts due Defendant from Busher Tire. Plaintiff alleges that it has made repeated demands that Defendant turn over the tires given to Defendant by Busher Tire or give Plaintiff the value of the tires.

Defendant has filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) contending that Plaintiff has failed to state a claim on which relief can be granted. Specifically, Defendant argues that Plaintiff has failed to state a cause of action for conversion under Illinois law. Defendant further contends that Plaintiff has failed to join an indispensable party to this action; namely, Busher Tire.

DISCUSSION

In analyzing a motion to dismiss, this court will not dismiss a complaint unless it is clear there are no set of facts that Plaintiff could prove consistent with the pleadings that would entitle it to relief. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Murphy v. Lane, 833 F.2d 106, 107 (7th Cir. 1987); Vaden v. Village of Maywood, 809 F.2d 361, 363 (7th Cir.), cert. denied, 482 U.S. 908 (1987). The court will accept all well-pleaded factual allegations in the complaint as true. Vaden, 809 F.2d at 363; Doe v. St. Joseph's Hospital of Fort Wayne, 788 F.2d 411, 414 (7th Cir. 1986). In addition, this court will view the allegations in a light most favorable to the non-moving party. Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984), cert. denied, 470 U.S. 1054 (1985); Wolfolk v. Rivera, 729 F.2d 1114, 1116 (7th Cir. 1984).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 2
Not Reported in F.Supp., 1990 WL 41126 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 41126)**

*2 Defendant first moves to dismiss Plaintiff's complaint on the basis that Plaintiff has failed to join an indispensable party in this action, namely, Busher Tire. In support of this part of Defendant's motion, Defendant contends that the presence of Busher Tire in this litigation as owner of the tires is absolutely essential so as to avoid any possibility of multiple or inconsistent obligations being imposed or inconsistent decisions by different courts concerning the transfer of the tires.

Rule 19 of the Federal Rules of Civil Procedure provides, in pertinent part:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

According to the above rule, anyone who is materially interested in the subject of an action should be joined as a party so that a complete disposition can be made of the case. The rule also notes that joinder cannot be accomplished in federal court when subject matter jurisdiction would be affected. When subject matter jurisdiction is affected, the case must be examined pragmatically and a choice made between the alternatives of proceeding with the action in the absence of particular interested persons and dismissing the action. See, Advisory Committee's notes to Rule 19.

*3 In the present case, Defendant admits that joinder of Busher Tire may destroy this court's jurisdiction over the matter. Busher Tire is an Illinois corporation that maintains its principal place of business in Rockford, Illinois. Plaintiff is also an Illinois entity. Jurisdiction of this court is based on diversity of citizenship pursuant to 28 U.S.C. §1332. Therefore, depending upon Busher Tire's alignment as a party, joinder could deprive this court of jurisdiction as diversity of citizenship between the parties may be destroyed. The court must, then, determine whether this action can proceed absent joinder of Busher Tire or whether this action must be dismissed.

At this stage of the proceedings, the court does not believe this action requires dismissal for failure to join Busher Tire. With the pleadings currently before the court, the court does not find Busher Tire to be an indispensable party. At this stage it appears that any relief the court may grant in this case would not be partial or "hollow" because of the absence of Busher Tire. The court would, in all probability, be able to render an ""adequate" judgment to the parties. Furthermore, Defendant would not face double or otherwise inconsistent liability should Busher Tire not be joined in the present cause of action. Any threat to Defendant of multiple litigation is not serious but is relatively minor. See, Advisory Committee's notes to Rule 19. Therefore, Defendant's motion to dismiss in this regard is denied.

Defendant also moves to dismiss the complaint on the grounds that Plaintiff has failed to state a cause of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00582 Document 31-4 Filed 05/12/2008 Page 14 of 14

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1990 WL 41126 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1990 WL 41126)

action for conversion. Tort cases involving conversion implicate State-created rights. When a federal court sitting in diversity deals with State-created rights, the federal court is, "in substance only another court of the State."Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 203 (1956). Accordingly, Illinois law governs this case. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

In Illinois, the elements necessary to establish a cause of action for conversion are:

(1) an unauthorized and wrongful assumption of control, dominion, or ownership by a person over the property of another;

(2) plaintiff's right in the property;

(3) plaintiff's right to immediate possession of the property; and

(4) a demand by plaintiff of possession thereof.

Katz v.Belmont Nat. Bank of Chicago, 112 Ill.2d 55, 96 Ill.Dec. 693, 698-99 (1986); deSt. Aubin v. Johnson, 151 Ill.App.3d 184, 104 Ill.Dec. 97, 101 (Ill.App. 1 Dist. 1986).

In the present case, even if the court takes all of Plaintiff's allegations as true, Plaintiff has failed to state a cause of action for conversion. Plaintiff has alleged that it made repeated demands of Defendant for the return of the tires or, alternatively, for the value of the tires. However, Plaintiff has not alleged Defendant took unauthorized or wrongful control of the tires from Busher Tire. Plaintiff also has not alleged that it had any right in the tires; that is, that Busher Tire was in default on the loans made to Busher Tire by Plaintiff. Finally, Plaintiff has not alleged a right to immediate possession of the tires. Plaintiff's complaint is simply devoid of any allegations that would establish the elements of a cause of action against Defendant for conversion. Accordingly, Defendant's motion to dismiss is granted in this regard. The court will, however, grant Plaintiff thirty days to file an amended complaint.

## CONCLUSION

*4 For the reasons set forth herein, Defendant's motion to dismiss is granted. Plaintiff has thirty days in which to file an amended complaint.

N.D.Ill., 1990.
First Community Nat. Bank v. General Tire, Inc.
Not Reported in F.Supp., 1990 WL 41126 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.